UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

UNITED STATES OF AMERICA

v.                                                    Case No:  2:15-cr-45-FtM-38MRM

RANFERI RAMIREZ-PORTILLO

_____

**REPORT AND RECOMMENDATION**

**TO THE UNITED STATES DISTRICT COURT**

    **I.**    **Introduction**

    This cause is before the Court on Defendant Ranferi Ramirez-Portillo's Motion to Suppress (Doc. 66) filed on June 1, 2015.  The Government filed a Response to Defendant's Motion to Suppress Evidence (Doc. 92) on June 15, 2015.  On June 24, 2015, Defendant filed a Reply (Doc. 95) to the Government's Response.  This matter was referred for a report and recommendation and an evidentiary hearing was held before the Undersigned on October 1, 2015.  A Transcript of the Motion to Suppress Hearing (hereinafter cited as "Tr." followed by the appropriate page number) was filed on November 2, 2015.  (Doc. 166).  Defendant is charged with conspiracy to possess with intent to distribute and to distribute marijuana in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(B)(vii) and 21 U.S.C. § 846; and possession with intent to distribute marijuana in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(D) and 18 U.S.C. § 2.  (Doc. 3 p. 1, 4).  Defendant is seeking to suppress all tangible physical evidence, statements, and identifications of the Defendant as a result of his encounter with law enforcement on December 5, 2012.  For the reasons explained below, the Court respectfully recommends that Defendant's Motion to Suppress be **DENIED**.

## II.      Summary of Evidence

The Government presented the testimony of five witnesses at the suppression hearing:

(1) Lieutenant James Loethen; (2) Thomas P. Hall; (3) Detective Robert Margrander; (4)

Detective Nora Galloway; and (5) Jonathan David Sass.  The Government entered five exhibits

into evidence:  (1) a copy of the lease agreement dated August 31, 2009, for 5451 Lee Street,

Building 2, Unit 1, Lehigh Acres, Florida 33971, in the name of Orville and Lissette Crespo

(Gov. Exhibit 1); (2) an array of photographs showing the exterior and interior of Unit 4 and Unit

5 at 5441 Lee Street, Building 2, Lehigh Acres, Florida (Gov. Exhibit 2.A-2.I); (3) an array of

photographs showing the evidence seized within Unit 4 and Unit 5 at 5441 Lee Street, Building

2, Lehigh Acres, Florida (Gov. Exhibit 3.A-3.Z); (4) a copy of the Use Immunity Letter sent to

Jonathan David Sass from the United States Attorney's Office dated September 29, 2015 (Gov.

Exhibit 4); and (5) a photograph of marijuana seized on December 5, 2012 (Gov. Exhibit 5).

Defendant did not call any witnesses and did not enter any additional exhibits into evidence.

### A.  Testimony of Lt. James Loethen

Lt. Loethen testified as follows.  He has been employed by the Lee County Sheriff's

Office for twenty three years.  (Tr. 7).  He is currently assigned to the Central District Patrol

Division as a Patrol Lieutenant.  (*Id.*).  At the time of December 5, 2012, Lt. Loethen was

assigned to the Watch Commander's Division, which entailed patrolling Lee County and

overseeing critical incidences that were dispatched.  (*Id.*).

On December 5, 2012, between 1:00 and 2:00 p.m., Lt. Loethen responded to a "shots

fired" call at a light industrial facility[1] in Lehigh Acres.  (Tr. 7-8).  Lt. Loethen explained that he

---

[1] Lt. Loethen never identifies the name of the "light industrial facility" in his testimony.  It is
clear from the other witnesses' testimony that Lt. Loethen is referring to the location named
Keller's Plaza.

was patrolling the area near where dispatch said shots were fired.  (Tr. 8).  He responded because he was was the closest unit to the call.  (*Id.*).  When he arrived, he made contact with the complainant, who was located in Unit 1 of the industrial business complex.  (*Id.*).  Lt. Loethen testified that the complainant advised him that she had heard several gunshots further down in the complex.  (*Id.*).

Lt. Loethen instructed the complainant to stay inside her business.  (*Id.*).  Lt. Loethen asked the complainant about the layout of the compound and the number of units it contained.  (*Id.*).  The complainant explained the background of the area and advised that there had been suspicious activity in the compound around Unit 5.  (Tr. 8-9).

Lt. Loethen then proceeded down the building towards Unit 5.  (Tr. 9).  While proceeding down the building, Lt. Loethen noticed that Units 2 and 3 had large, open pane-glass windows through which he could see the front entranceway of the units.  (*Id.*).  These units appeared to be vacant to Lt. Loethen because there were no displays on the windows and he could see into the units' reception areas.  (Tr. 10).

When Lt. Loethen reached Unit 4 and Unit 5, he noticed that the units' pane-glass windows were covered with paper or snow film.  (Tr. 11).  It appeared to him as if the units were being painted or undergoing renovations because the windows were not open like the other units.  (*Id.*).  The windows on the doors of the units were covered as well.  (*Id.*).  Other than the coverings on the doors and windows, Lt. Loethen's attention was drawn to Unit 4 and Unit 5 because they were the only units in front of which cars were parked.  (Tr. 12).

Lt. Loethen proceeded to knock on the door of one of the units to try to determine if the unit was occupied.  (*Id.*).  Lt. Loethen could hear ruffling and movement inside after he knocked.  (*Id.*).  Lt. Loethen also heard multiple voices within the units.  (*Id.*).  These sounds primarily came from Unit 5.  (*Id.*).  Lt. Loethen continued to knock and identify himself as a law

enforcement officer with the Lee County Sheriff's Office.  (*Id.*).  Lt. Loethen checked the door and it was locked.  (*Id.*).  When no one answered, Lt. Loethen proceeded down the complex towards Units 6, 7, and 8, and saw that these units were not occupied.  (*Id.*).

By this time, other law enforcement officers were arriving on-scene.  (Tr. 12-13).  As they arrived, Lt. Loethen assigned the officers to positions of concern based on his tactical experience and the scenario at hand.  (Tr. 14).  Lt. Loethen assigned the first officers that responded to the rear of Unit 5 to watch if anyone ran out of the back of the unit.  (Tr. 15).  As more officers arrived on-scene, Lt. Loethen positioned them in the front and rear of the building.  (Tr. 15-16).

After the front and rear of the building were secured, Lt. Loethen came into contact with the maintenance person for the facility, who offered Lt. Loethen a key to all the units.  (Tr. 17).  While this was occurring, law enforcement was making announcements identifying themselves and telling the occupants inside Unit 4 and Unit 5 to open the doors.  (Tr. 18).  This was occurring approximately twenty to thirty minutes after Lt. Loethen had arrived on-scene.  (*Id.*).

The maintenance person offered Lt. Loethen the phone number of Orville Crespo, the person who rented Unit 4 and Unit 5.  (*Id.*).  Lt. Loethen called the number and Mr. Crespo identified himself and confirmed that he rented Unit 4 and Unit 5.  (Tr. 18-19).  Lt. Loethen testified that Mr. Crespo stated that nobody was supposed to be in the units and that he had been in South Fort Myers that day and was on his way back.  (Tr. 18-19).  Lt. Loethen advised Mr. Crespo that the maintenance person on-scene had offered him a key to the units and asked Mr. Crespo for permission to use the key to open the door and ensure that everyone inside was safe.  (Tr. 20).  Lt. Loethen testified that Mr. Crespo understood and gave his full permission for law enforcement to use the key to gain entry into his leased storage units.  (*Id.*).

During this time, Lt. Loethen received a report from the law enforcement team in the

front of the units that the front door of Unit 5 had opened and someone had looked out from the door and saw law enforcement officers stacked along pillars in front of the unit. (*Id.*). The person who looked out from the front door closed the door and relocked it. (*Id.*). This was the first visual confirmation law enforcement had that people were inside the units. (*Id.*). This occurrence heightened Lt. Loethen's concern because it eliminated the possibility that the people inside the units could not hear law enforcement's prior announcements. (Tr. 21).

Lt. Loethen explained that his plan was for law enforcement to use the key to unlock the door in the rear of one of the units, swing the door outward, and re-announce for the occupants inside to come out one at a time with their hands up. (Tr. 22). Lt. Loethen explained that this would give the occupants an opportunity to exit on their own without putting law enforcement in any further danger because it was unknown what was inside the units. (*Id.*).

Law enforcement unlocked the door and opened it. (*Id.*). Lt. Loethen noted two observations after the door opened. (*Id.*). First, he noted that it was completely dark inside. (*Id.*). Second, he noted the overwhelming odor of unburnt or fresh marijuana. (Tr. 23). To Lt. Loethen, this fact changed the nature of the investigation from not only a "shots fired" and preservation of life case, but also a narcotics case. (*Id.*). Based on his experience, Lt. Loethen knew that the smell was of unburnt marijuana and was not from the occupants smoking it recreationally. (*Id.*).

Law enforcement continued announcing for the occupants to come out with their hands up. (Tr. 24). After approximately two or three minutes of repeated announcements, the first individual came out. (Tr. 25). This individual confirmed that there were two more people inside. (*Id.*). After law enforcement announced again, a second person exited, and then a third person also exited. (Tr. 25-26). Lt. Loethen felt comfortable that everyone was outside of the building after the third person exited. (Tr. 26).

Lt. Loethen selected four law enforcement officers to enter the premises with him for the purpose of checking for injured people and to ensure that the premises were secure. (Tr. 26-27). Lt. Loethen was concerned someone may have been injured because the call made was for "shots fired." (Tr. 27). Lt. Loethen testified that no objects were moved during this security sweep. (Tr. 27).

Upon entering, Lt. Loethen learned that the wall that would have separated Unit 4 and Unit 5 had been removed and that the two garage units were, in fact, one big unit. (Tr. 28). Lt. Loethen described the scene as a mechanic shop with tools, cars that had been worked on, and engine parts lying around. (*Id.*). During the security sweep, Lt. Loethen noticed a substantial amount of marijuana in vacuum-sealed bags that were lying throughout different parts of the units. (Tr. 29). Some of the bags were in Tupperware containers in the back seat of one of the cars that was disassembled. (*Id.*). Lt. Loethen testified that he instructed the officers accompanying him on the protective sweep to not touch anything. (*Id.*). Lt. Loethen noticed that there was water on the floor during the protective sweep, but he did not make a "huge note" of it at the time. (*Id.*).

After conducting the protective sweep, Lt. Loethen contacted the Narcotics Unit and was put in touch with Det. Nora Galloway, who was on her way to the scene. (Tr. 30). At this time, Lt. Loethen noticed a large amount of water coming from underneath the bay door of Unit 4. (*Id.*). Lt. Loethen talked to the maintenance person, who expressed concern that the water may cause damage to the building. (Tr. 30-31). Lt. Loethen reentered the building to determine the source of the water. (Tr. 31). Lt. Loethen found that the water was coming from a ruptured water line in a deep sink that sat outside the bathroom of Unit 4. (*Id.*). Lt. Loethen looked for a shutoff valve so he could stop the flow of water. (*Id.*). Lt. Loethen forced open a door that separated the offices of Unit 4 and Unit 5, which led into a bathroom where the shutoff valve

was located.  (*Id.*).  Lt. Loethen shut off the water valve.  (*Id.*).  Lt. Loethen testified that he

believed one of the occupants broke the water line before exiting the unit.  (*Id.*).

Lt. Loethen saw no evidence of gunfire inside Unit 4 or Unit 5 or the surrounding area.

(Tr. 32).  The only suggestion of gunfire was from the complainant who made the call and who

spoke with Lt. Loethen when he first arrived on scene.  (*Id.*).

At some point after Lt. Loethen shut off the water valve, Det. Galloway arrived on-scene.

(*Id.*).  Det. Galloway secured a sworn, taped statement from Mr. Crespo that he was the lessee of

Unit 4 and Unit 5, and that he had given Lt. Loethen and Det. Galloway permission to walk

through the units to identify anything that was in the units that was not there earlier in the day.

(*Id.*).  Having received permission, Lt. Loethen, Det. Galloway, and Mr. Crespo entered the

units.  (Tr. 32-33).  As they walked through, Mr. Crespo pointed out bales of marijuana and

stated that they were not there earlier, and that he did not know where they came from.  (Tr. 33).

Lt. Loethen testified that this walkthrough also uncovered some paraphernalia in Unit 5's office

area, including a scale, bags, and wrapping paper.  (*Id.*).  Mr. Crespo told Lt. Loethen that he was

last at Unit 4 and Unit 5 the morning of the incident.  (*Id.*).

On cross examination, Lt. Loethen testified that the complainant indicated that she had

heard four to five gunshots.  (Tr. 35).  The complainant described the gunshots as sequential,

which indicated to Lt. Loethen that the gunshots had come from a semiautomatic handgun or a

revolver, but not a fully automatic weapon.  (Tr. 36).  The complainant did not indicate that she

had seen anyone firing a firearm or had seen any victim of gunshots.  (*Id.*).

Lt. Loethen testified that the complainant explained that she had seen suspicious activity

occur around Unit 5 in that different types of vehicles came and went from the area, men walked

in and out of the business, and that she had observed men having heated arguments.  (*Id.*).  The

complainant did not understand what kind of business was being conducted in the unit.  (Tr. 36-

37).

Lt. Loethen testified that he had asked the maintenance person if he had heard any gunshots and the maintenance person stated that he had not. (Tr. 38-39). Lt. Loethen testified that while walking outside the building, he found no evidence that gunshots had been fired. (Tr. 40). Lt. Loethen testified that the complainant was unable to tell him if what she thought were gunshots came from inside or outside of the building. (Tr. 41).

Lt. Loethen testified that gunshots can be heard approximately a quarter of a mile away in open terrain. (Tr. 43). Lt. Loethen testified that it is possible that the gunshots the complainant could have heard emanated from an area outside the facility, but given that the claimant was inside her business at the time, it was more reasonable that she heard the gunshots from a closer distance. (*Id.*).

Lt. Loethen testified that during a deposition on April 17, 2013, he had testified that Mr. Crespo told him that a friend of his by the name of Samir Jamil Rashid[2] was permitted to be in Unit 4 and Unit 5 to fix his cars on the date of the incident. (Tr. 44-45).

Lt. Loethen testified that approximately twelve officers responded to the location. (Tr. 47). Lt. Loethen testified that these officers did not conduct sweeps of the area to look for evidence. (*Id.*).

Lt. Loethen testified that he did not actually see one of the occupants look out of the front door of Unit 5. (Tr. 48). Lt. Loethen stated that he could not recall if the occupants of the units were directed to come out in English or in Spanish. (*Id.*).

Lt. Loethen testified that there was no indication that the three individuals who exited the building were injured or had used weapons. (Tr. 50-51). The occupants were each patted down

---

[2] Mr. Rashid is a co-defendant in this case.

and placed in separate patrol cars. (*Id.*).

Lt. Loethen testified that he could not recall whether he asked Mr. Rashid for his consent to search the units. (Tr. 56). Lt. Loethen explained that no matter whether Mr. Rashid consented to the search or not, his response would not have taken priority over Lt. Loethen's concerns for the preservation of life, given that the call was for shots fired and law enforcement's concern that the occupants had barricaded themselves inside the units. (*Id.*).

Lt. Loethen testified that the legal basis for his reentry into the units after the protective sweep was to prevent the continuous damage to the building that the broken water main was causing. (Tr. 58). Lt. Loethen testified that the legal basis for the subsequent walkthrough with Det. Galloway was that Mr. Crespo was present. (Tr. 62). Lt. Loethen testified that during this walkthrough, law enforcement spotted numerous blue Tupperware bales, and one of these was on top of the bathroom for Unit 4, which could be seen from the ground. (Tr. 67). Lt. Loethen explained that the walkthrough was not a search and that he was not present when the marijuana was actually seized. (Tr. 68-69).

On redirect examination, Lt. Loethen testified that law enforcement conducted a protective sweep after the occupants had exited the building to ensure that no one was hiding or injured inside. (Tr. 73). Lt. Loethen testified that law enforcement would not have taken the occupants at their word that no one else was inside. (*Id.*).

### B. Testimony of Thomas P. Hall

Mr. Hall testified as follows. He is the Vice President in charge of property management for Hook & I, LLC, which owns the buildings at issue in this case. (Tr. 81). His duties include interfacing with the building's leasing agent and ensuring that the property is maintained in proper running order. (*Id.*). He is the custodian of records for Hook & I, LLC. (*Id.*).

Mr. Hall testified that the Government's Exhibit 1 is a lease agreement dated August 31,

2009, between Hook & I, LLC as lessor and Orville and Lissette Crespo as tenants, for unit number one, building number two at 5451 Lee Street. (Tr. 80). Mr. Hall testified that this lease was amended sometime in 2010 when Mr. Crespo approached him and indicated that he needed more space. (Tr. 82). Mr. Crespo moved to Unit 4 and Unit 5 of the building that is identified as 5441 Lee Street. (*Id.*). This amendment to the lease was memorialized in writing, but Mr. Hall was unable to find a copy of the amendment despite diligently searching. (*Id.*). The amended lease specified that Mr. Crespo rented all of Unit 5 and the warehouse portion of Unit 4, but not the office portion of Unit 4. (Tr. 83). Mr. Hall explained that Unit 4 and Unit 5 were originally stand-alone units, but a wall was removed to conjoin the warehouse portions of the premises. (*Id.*). Mr. Hall testified that initially Mr. Crespo purported to be a race-car fabricator, but when he moved into Unit 4 and Unit 5 he was doing light automotive repair. (*Id.*).

On cross examination, Mr. Hall testified that Unit 5 is approximately 1,225 square feet, that the facility contains over 20,000 square feet and occupies two acres. (Tr. 86). Mr. Hall testified that the facility is surrounded by vacant land and commercial property. (Tr. 87).

**C. Testimony of Det. Robert Margrander**

Det. Margrander testified as follows. He is a detective with the Lee County Sheriff's Office and has been employed there since September 2007. (Tr. 88). He has no law enforcement experience prior to joining the Lee County Sheriff's Office. (Tr. 89).

On December 5, 2012, Det. Margrander received a call for shots fired in the area of Keller's Plaza. (*Id.*). When Det. Margrander arrived, Lt. Loethen was already on-scene. (*Id.*). Lt. Loethen was on the west side of the building, where the bay doors are located. (*Id.*). Det. Margrander went to the east of the building where there are smaller, single doors. (*Id.*). Det. Margrander explained at the hearing that the east side is the front of the building and the west side is the back of the building. (*Id.*).

Det. Margrander tried to make contact with the individuals inside the units by knocking and announcing.  (Tr. 90).  Approximately five to ten minutes after he was on-scene, an individual opened the door to Unit 5 and then immediately shut it.  (*Id.*).  Det. Margrander reported what he observed over the radio.  (*Id.*).  A few minutes after the door had opened and shut, Det. Margrander observed water leaking underneath the door.  (*Id.*).

Det. Margrander testified that he participated in clearing Unit 4 and Unit 5.  (Tr. 91).  Det. Margrander and another deputy also cleared the buildings north of Unit 4 and Unit 5.  (*Id.*).

On cross examination, Det. Margrander testified that he did not observe any people, blood, bullet casings, or any other evidence of gunshots while conducting the protective sweep.  (Tr. 95).  He also did not observe any contraband.  (*Id.*).

**D.  Testimony of Det. Nora Galloway**

Det. Galloway testified as follows.  She is a detective in the Narcotics Unit with the Lee County Sheriff's Office.  (Tr. 97).  She has been employed by the Lee County Sheriff's Office for twelve years.  (*Id.*).  Prior to her employment with the Lee County Sheriff's Office she worked for a small police department in Idaho.  (*Id.*).

On December 5, 2012, Det. Galloway was informed that deputies who had responded to a "shots fired" call in a storage facility had seen what they suspected to be marijuana in vacuum-sealed packages when they conducted a protective sweep of the storage facility.  (Tr. 98).  Det. Galloway was called to the scene, and when she arrived she interviewed the complainant and spoke with Mr. Crespo.  (Tr. 98-99).  Mr. Crespo identified himself as the lessee of Unit 4 and Unit 5 and explained that he had given the key to the storage unit to his friend, Mr. Rashid, at approximately 5:30 a.m. to allow him to perform work on some vehicles.  (Tr. 99).  Mr. Crespo stated that he was not present the entire day.  (*Id.*).  Mr. Crespo stated that he did not know anything about any marijuana being in the units.  (Tr. 100).  Det. Galloway asked Mr. Crespo if

he would consent to a search of Unit 4 and Unit 5, and Mr. Crespo gave his consent.  (*Id.*).  Mr. Crespo also signed a Consent to Search form.  (Tr. 101).

Det. Galloway, Lt. Loethen, and Mr. Crespo then went into Unit 4 and Unit 5.  (*Id.*).  As they walked throughout the storage units, they could see the packages of marijuana scattered throughout.  (*Id.*).  Mr. Crespo stated that the packages did not belong to him.  (*Id.*).  Mr. Crespo also denied that the boxes, Christmas wrappings, and vacuum sealer that were in the front of the building were his.  (*Id.*).  Det. Galloway testified that she could smell the odor of marijuana when she approached the units.  (*Id.*).

On cross examination, Det. Galloway testified that she was summoned to Keller's Plaza, the scene of the incident, by her Sergeant.  (Tr. 111).  She did not participate in the investigation concerning the allegation that shots had been fired, but was there for a narcotics investigation.  (Tr. 112-113).  When she arrived on-scene, three individuals had been detained and were sitting in the back of different patrol vehicles.  (Tr. 113).  Det. Galloway attempted to communicate with each individual, but they would not speak to her.  (*Id.*).  Before she could ask any questions, they each requested a lawyer.  (*Id.*).  Det. Galloway testified that she could not remember if she had read them their Miranda rights, but that they stated they wanted a lawyer before she said anything.  (Tr. 114).

Det. Galloway testified that she spoke with Mr. Crespo as soon as she arrived on-scene.  (*Id.*).  Det. Galloway testified that no one informed her that keys had been found on Mr. Rashid.  (Tr. 115).

Det. Galloway testified that she interviewed the complainant, Christy Boring, who stated that she had heard four consecutive loud noises which she believed were gunshots coming from the same building that she was in.  (Tr. 117).  Ms. Boring told Det. Galloway that she and another employee were in such fear that they locked their business doors and hid under their

desks.  (*Id.*).  Det. Galloway testified that there are at least five units in the building Ms. Boring

was located in.  (*Id.*).  Det. Galloway testified that Ms. Boring also mentioned that she had seen

vehicles arriving and she described individuals that had been seen going to the business.  (Tr.

118).

Det. Galloway testified that she did not obtain a warrant because the lessee of the units

consented to a search.  (Tr. 120).  Det. Galloway was aware that one of the individuals detained

had permission to work on cars inside the units.  (Tr. 120-121).  Det. Galloway never asked Mr.

Rashid if he consented to a search.  (Tr. 121).

Det. Galloway testified that the walkthrough with Lt. Loethen and Mr. Crespo lasted

approximately 5 to 10 minutes.  (Tr. 122).  Law enforcement did not take down the package of

marijuana above the bathroom during this walkthrough.  (Tr. 123).

After the initial walkthrough, and after talking to Mr. Crespo, Det. Galloway reentered

the units with her partner Det. Newman and gathered the marijuana.  (Tr. 124).  Det. Galloway

testified that this process took hours to complete.  (*Id.*).  Det. Galloway never ascertained

whether Mr. Rashid was the owner of any of the vehicles in the units or whether he had property

inside the units.  (Tr. 125).

**E.  Testimony of Jonathan D. Sass**

Mr. Sass testified as follows.  He is 26 years old and graduated from Florida Gulf Coast

University in 2012.  (Tr. 128).  Mr. Sass began selling marijuana around 2010.  (*Id.*).  Mr. Sass's

sole supplier of marijuana was Mr. Rashid.  (*Id.*).  Mr. Sass testified that he and Mr. Rashid

would receive shipments from California on a weekly basis.  (Tr. 129).  Mr. Rashid would

arrange a time and place for him and Mr. Sass to pick up the marijuana and bring it to their

houses.  (*Id.*).  Mr. Sass explained that the marijuana would be packaged, vacuum-sealed by the

pound, and shipped in duct-taped Tupperware bins.  (*Id.*).  Mr. Sass testified that Defendant

would deliver marijuana for Mr. Rashid.  (Tr. 132).

Mr. Sass testified that on December 5, 2012, he intended to meet Mr. Rashid to pick up a shipment of marijuana.  (Tr. 136).  While traveling from Winter Haven to the scene, Mr. Sass spoke with Mr. Rashid on the phone, who told him that they had received their package of marijuana and that everything looked good.  (Tr. 137).  During their conversation, Mr. Rashid stated that someone had "just pulled up," that "the cops are here," and that he would have to call Mr. Sass back.  (*Id.*).  Mr. Sass learned later that day that Mr. Rashid had been arrested.  (*Id.*).

On cross-examination, Mr. Sass testified that he was aware that Mr. Rashid operated a legitimate business, the Layla Hookah Lounge.  (Tr. 142).  Mr. Sass testified that Defendant was employed by the Layla Hookah Lounge and worked the cash register and prepared the hookahs.  (Tr. 143).  Mr. Sass testified that Defendant was not a distributor of marijuana.  (*Id.*).

### III.    Analysis

Defendant argues that suppression is warranted because law enforcement unlawfully searched Unit 4 and Unit 5 without a warrant and no exception to the warrant requirement applies.  The Government argues that Defendant lacks standing to challenge the search of Unit 4 and Unit 5, and that law enforcement's entry was justified by Mr. Crespo's consent.

In order to have standing to challenge a search, a person "must manifest a subjective expectation of privacy in the invaded area that 'society is prepared to recognize as reasonable.'" *United States v. Cooper*, 133 F. 1394, 1398 (11th Cir. 1998) (quoting *Rakas v. Illinois*, 439 U.S. 128, 143 n.12 (1978)).  The "legitimation of expectations of privacy by law must have a source outside of the Fourth Amendment, either by reference to concepts of real or personal property law or to understandings that are recognized and permitted by society.  *Rakas,* 439 U.S. at 143 n.12.  To determine whether a defendant has a legitimate expectation of privacy, courts look to such factors as (1) whether the defendant had a possessory interest in the place searched or the

property seized, (2) whether the defendant had the right to exclude others from that place, (3) whether the defendant exhibited a subjective expectation that it would remain free from governmental invasion, (4) whether the defendant took precautions to maintain his privacy, and (5) whether the defendant was legitimately on the premises. *United States v. Haydel*, 649 F.2d 1152, 1155-54 (5th Cir. 1981 Unit A July 1981) (citations omitted).

The Supreme Court has long held that "a defendant can urge the suppression of evidence obtained in violation of the Fourth Amendment only if that defendant demonstrates that *his* Fourth Amendment rights were violated." *United States v. Padilla*, 508 U.S. 77, 81 (1993) (emphasis in original) (citations omitted). "Fourth Amendment rights are personal rights which, like some other constitutional rights, may not be asserted vicariously." *Alderman v. United States*, 394 U.S. 164, 174 (1969). The individual who challenges a search bears the burden of proving standing. *United States v. Harris*, 526 F.3d 1334, 1338 (11th Cir. 2008).

In this case, the Court finds that Defendant does not have standing to challenge the searches of Unit 4 and Unit 5. First, there is no indication that Defendant, Ranferi Ramirez-Portillo, had any possessory interest whatsoever in Unit 4 and Unit 5, or that he stored any personal items inside the units. There is no evidence that Defendant was given a key to the units or permission by the lessee to be present in Unit 4 and Unit 5. In fact, as to the office partition of Unit 4, where certain paraphernalia were located by law enforcement, not even Mr. Crespo had a leasehold interest in that space. As such, he had no ability to allow Mr. Rashid to utilize that space and Mr. Rashid, in turn, had no ability to allow Defendant to utilize that space.

Second, there is no indication that Defendant had the right to exclude others from the premises or exert any control on the premises. The testimony presented at the hearing established that Defendant was inside Unit 4 and Unit 5 upon the invitation of Mr. Rashid, who in turn was given permission by the lessee of the units, Mr. Crespo, to use the units for the

limited purpose of conducting automotive repair.  At best, Defendant was an invitee of an invitee (or a guest of a guest) with no interest in or control over the premises in question.

Third, there is no indication that Defendant exhibited any subjective expectation that Unit 4 and Unit 5 would remain free from governmental invasion.  While Lt. Loethen testified that the windows in the front of Unit 4 and Unit 5 were covered with paper or snow film (Tr. 11), there is no evidence that Defendant covered the windows or that the windows were covered to protect Defendant's subjective expectation of privacy.

Fourth, there is no evidence that Defendant himself took any precautions to maintain his privacy inside Unit 4 and Unit 5.  Finally, it is ambiguous from the testimony presented at the hearing whether Defendant was legitimately on the premises.  Although Lt. Loethen testified that Mr. Crespo had given Mr. Rashid permission to use the units to repair his vehicle (Tr. 44-46), there is no indication that this permission extended to Defendant as Mr. Rashid's purported invitee or guest.  In fact, there is no indication that Mr. Crespo's permission to Mr. Rashid gave Mr. Rashid the authority to invite others.  Applying these factors, the Court finds that Defendant has failed to carry his burden of establishing that he had a legitimate expectation of privacy in Unit 4 and Unit 5.

In his Motion to Suppress, Defendant contends that he had a reasonable expectation of privacy because he was an invited guest of Mr. Rashid.  (*See* Doc. 66 p. 6) ("Samir Rashid . . . had a reasonable expectation of privacy in the units which is one that society is generally prepared to accept . . . [a] fortiori, defendant had a reasonable expectation of privacy in the same premises because he was the invited guest of co-defendant Samir Rashid . . . .").  For the reasons stated above, the Court does not find this argument persuasive.  Even assuming, *arguendo*, that Mr. Rashid had a reasonable expectation of privacy in Unit 4 and Unit 5, it does not follow that Defendant has standing.  The Supreme Court has explained that "[a] person who is aggrieved by

an illegal search and seizure only through the introduction of damaging evidence secured by a search of a third person's premises or property has not had any of his Fourth Amendment rights infringed." *Rakas*, 439 U.S. at 134. Defendant has failed to show that he had a personal expectation of privacy in the units, and he may not vicariously assert the rights to which Mr. Rashid may (or may not) be entitled.[3] In this way, the determination of whether Mr. Rashid exercised dominion and control of the units, or would have consented to a search of the units, is not relevant as to whether Defendant personally had an expectation of privacy in the units.

Further, Defendant argues that he had a legitimate expectation of privacy in Unit 4 and Unit 5 because: (1) "he spent significant periods of time at the auto mechanics shop for weeks prior to this incident;" (2) "he has not disavowed or minimized his relationship to the premises;" and (3) "he had a vehicle and other personal property in the units and used them to perform work on his property." (Doc. 66 p. 6). There is no evidence from the hearing, however, to support these claims.

Defendant has simply failed to carry his burden of establishing his standing as a threshold matter and the Undersigned finds that Defendant's Motion to Suppress should be denied. Moreover, because Defendant has no standing, there is no basis for considering Defendant's remaining arguments concerning the searches of Unit 4 and Unit 5. *See, e.g.*, *Minnesota v. Carter*, 525 U.S. 83, 91 (1998) (declining to determine whether a defendant's rights were violated by a government search where the defendant had no legitimate expectation of privacy in the searched location).

---

[3] The Court makes no finding or recommendation as to whether Mr. Rashid may or may not have standing.

While Defendant lacks standing to challenge the searches of Unit 4 and Unit 5, Defendant does have standing to challenge the legality of the seizure of his person. *Brendlin v. California*, 551 U.S. 249, 254 (2007) ("A person is seized by the police and thus entitled to challenge the government's action under the Fourth Amendment when the officer, by means of physical force or show of authority, terminates or restrains his freedom of movement.") (internal citations omitted). In his Motion to Suppress, Defendant contends that law enforcement did not have reasonable suspicion or probable cause to believe that he was engaged in criminal activity. (Doc. 66 p. 13).

Law enforcement may briefly detain a person for an investigatory stop if they have a reasonable, articulable suspicion based on objective facts that the person has engaged, or is about to engage, in criminal activity. *See Terry v. Ohio*, 392 U.S. 1, 30 (1968). When reviewing the reasonable suspicion determination of law enforcement,

> the Court looks to the totality of the circumstances to see if the officer has a particularized and objective basis for suspecting legal wrongdoing. *U.S. v. Cortez*, 449 U.S. 411, 417, 101 S. Ct. 690, 66 L. Ed. 2d 621 (1981). Police officers are allowed to make inferences from their own experience and specialized training and make inferences from and deductions about the cumulative information available to them that might well elude an untrained person. *U.S. v. Arvizu*, 534 U.S. 266, 273, 122 S. Ct. 744, 151 L. Ed. 2d 740 (2002) (citing *Cortez*, 449 U.S. at 418, 101 S. Ct. 690). The concept of reasonable suspicion is not reducible to a "neat set of legal rules," and conduct which is innocent in itself may still establish reasonable suspicion in light of an officer's specialized training and familiarity with the customs of an area's inhabitants. *Id.* at 274–276, 122 S. Ct. 744. A determination that reasonable suspicion exists need not rule out the possibility of innocent conduct. *Id.* at 277–278, 122 S. Ct. 744. If reasonable suspicion exists, an officer may "stop the person for a brief period of time and take additional steps to investigate further." *Hiibel v. Sixth Judicial District Court of Nevada*, 542 U.S. 177, 124 S. Ct. 2451, 2458, 159 L. Ed. 2d 292 (2004).

*United States v. Davis*, 65 F. Supp. 3d 1352, 1357 (M.D. Fla. 2014). While courts have used a variety of terms to describe what cause is sufficient to authorize police to stop a person, "the

essence of all that has been written is that the totality of the circumstances—the whole picture—must be taken into account." *Cortez*, 449 U.S. at 417-18.  The Supreme Court has "made clear that reasonable suspicion may exist even if each fact 'alone is susceptible of innocent explanation.'"  *United States v. Bautista-Silva*, 567 F.3d 1266, 1272-73 (11th Cir. 2009) (citing *Arvizu*, 534 U.S. at 277-78).

    In this case, the undisputed testimony at the hearing established that law enforcement responded to a "shots fired" call originating from Keller's Plaza in Lehigh Acres, Florida, on December 5, 2012.  Lt. Loethen was the first officer to arrive on-scene and to make contact with the complainant, Ms. Boring, who reported that she had heard several gunshots from within the complex.  (Tr. 8).  Ms. Boring stated to law enforcement that she and another employee were in such fear that they locked their business doors and hid under their desks.  (Tr. 117).  Ms. Boring reported to Lt. Loethen that there had been suspicious activity around Unit 5 of the complex. (Tr. 8-9).  Lt. Loethen investigated and knocked on the door to either Unit 4 or Unit 5.  (Tr. 12). Lt. Loethen could hear voices and movement inside the units.  (Tr. 12).  Lt. Loethen knocked and announced his presence multiple times but the occupants in the units did not respond.  (Tr. 12). After several more law enforcement officers arrived on-scene, one of the occupants peered out of the front door of Unit 5, saw that law enforcement officers were present, and then nevertheless closed and relocked the door.  (Tr. 20, 90).

    These facts, in combination with the occupants' failure to exit the units upon law enforcement's commands and the strong odor of unburnt marijuana coming from the units once the door was opened, gave rise to reasonable suspicion that Defendant was engaged in criminal activity.  Thus, Defendant's rights were not violated when he was detained upon exiting the units while law enforcement conducted a protective sweep of the units.  Upon observing marijuana located within the storage units during the protective sweep, law enforcement had probable cause

to believe Defendant was engaged in a narcotics-related crime.  *See United States v. Floyd*, 281 F.3d 1346, 1348 (11th Cir. 2002) (per curiam) ("Probable cause to arrest exists when law enforcement officials have facts and circumstances within their knowledge sufficient to warrant a reasonable belief that the suspect had committed or was committing a crime.").  In this way, Defendant's rights were not violated when he was detained and eventually arrested.

    **IV.    Conclusion**

    For the foregoing reasons, Defendant does not have standing to challenge law enforcement's searches of Unit 4 and Unit 5, and Defendant was lawfully detained and arrested. Accordingly,

**IT IS RESPECTFULLY RECOMMENDED THAT:**

    Defendant's Motion to Suppress (Doc. 66) be **DENIED**.

**Respectfully recommended** in Chambers in Fort Myers, Florida on December 11, 2015.

MAC R. MCCOY
UNITED STATES MAGISTRATE JUDGE

## NOTICE TO PARTIES

    A party has fourteen days from this date to file written objections to the Report and Recommendation's factual findings and legal conclusions.  A party's failure to file written objections waives that party's right to challenge on appeal any unobjected-to factual finding or legal conclusion the district judge adopts from the Report and Recommendation.  *See* 11th Cir. R. 3-1.

Copies furnished to:

Counsel of Record
Unrepresented Parties